## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

BRETTE LAMONT WHITE,　　　：
　　　　　　　　　　　　　　：
　　　　　　Plaintiff　　　：　　No. 3:13-CV-2033
　　　　　　　　　　　　　　：
　　　vs.　　　　　　　　　：　　(Judge Nealon)
　　　　　　　　　　　　　　：
CAROLYN W. COLVIN,[1] Acting　：
Commissioner of Social Security,　：
　　　　　　　　　　　　　　：
　　　　　　Defendant　　　：

FILED
SCRANTON

AUG 2 8 2014

PER _____
DEPUTY

## MEMORANDUM

On July 29, 2013, Plaintiff, Brette Lamont White, filed this appeal[2] under 42
U.S.C. § 405 for review of the decision of the Commissioner of Social Security
denying his claim for disability insurance benefits ("DIB") under Title II of the
Social Security Act, 42 U.S.C. §§ 400-403, and for supplemental security income
("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.
(Doc. 1). The parties have fully briefed the appeal. For the reasons set forth

---

1. Carolyn W. Colvin became the Acting Commissioner of the Social Security
Administration ("SSA") on February 14, 2013, and is substituted for Michael J.
Astrue as the Defendant in this case pursuant to Federal Rule of Civil Procedure
25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

below, the decision of the Commissioner denying Plaintiff's application for DIB

and SSI will be affirmed.

## BACKGROUND

Plaintiff protectively filed[3] his application for DIB and SSI on August 3,

2010.  (Tr. 15).[4]  The claims were both initially denied by the Bureau of Disability

Determination ("BDD")[5] on January 25, 2011.  (Tr. 15).  On March 8, 2011,

Plaintiff filed a written request for a hearing before an administrative law judge.

(Tr. 15).  A hearing was held on April 19, 2012 before administrative law judge

Randy Riley ("ALJ"), at which Plaintiff and vocational expert, Sheryl Bustin

("VE"), testified.  (Tr. 20, 61).  On May 3, 2012, the ALJ issued a decision

denying Plaintiff's claims because, as will be explained in more detail infra,

Plaintiff could perform less than a full range of sedentary work with the option to

alternate between sitting and standing at will such as that performed by a dowel

---

3. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on November 13, 2013.  (Doc. 11).

5. The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

inspector.  (Tr. 18, 22).

On May 18, 2012, Plaintiff filed a request for review with the Appeals

Council.  (Tr. 10).  On May 31, 2013, the Appeals Council concluded that there

was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus,

the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on July 29, 2013.  (Doc. 1).  On

November 13, 2013, Defendant filed an Answer and Transcript from the Social

Security Administration ("SSA") proceedings.  (Docs. 10 and 11).  Plaintiff filed

his brief in support of his complaint on December 27, 2013.  (Doc. 13)[6].

Defendant filed his brief in opposition on January 21, 2014.  (Doc. 14).  Plaintiff

filed a reply brief on January 30, 2014.  (Doc. 15).  The matter is now ripe for

review.

Disability insurance benefits are paid to an individual if that individual is

disabled[7] and insured, that is, the individual has worked long enough and paid

_____

6. It is noted that Plaintiff improperly docketed his support brief as a motion for
summary judgment, (Doc. 12), and a brief in support, (Doc. 13).  Both documents
are identical and are titled "Plaintiff's Brief Pursuant to Local Rule 83.40.4 in
Support of his Appeal of the Denial of his Social Security Claim."  Therefore, both
documents will be addressed as one support brief for the Complaint, and
Document 13 will be referred to when referencing the support brief.

7. To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the date last insured.  It is undisputed that

Plaintiff meets the insured status requirements of the Social Security Act through

March 31, 2014.  (Tr. 17).

Plaintiff was born in the United States on November 12, 1966, and at all

times relevant to this matter was considered a "younger individual"[8] whose age

---

physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

8.  The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work.  However, in some circumstances, we consider that persons age 45-

would not seriously impact his ability to adjust to other work.  20 C.F.R. §§ 404.1563(c); (Tr. 21).

Plaintiff obtained his GED, and can communicate in English.  (Tr. 146-147).  His employment records indicate that he previously worked as a delivery man.  (Tr. 157).

The records of the SSA reveal that Plaintiff had earnings in the years 1984 through 2010.  (Tr. 132).  His annual earnings range from a low of no earnings from 1995 to 1998 to a high of $14,248.05 in 2006.  (Tr. 132).  His total earnings during those twenty-six (26) years were $88,951.59.  (Tr. 132).

Plaintiff's alleged disability onset date is June 2, 2010.  (Tr. 143, 146, 148).  The impetus for his claimed disability is a combination of left shoulder and back impairments and obesity.  (Tr. 147).  In a document entitled "Function Report - Adult" filed with the SSA in October of 2010,  Plaintiff indicated that he was single and lived with a friend.  (Tr. 169).  He noted that he could dress, shower, do dishes, and take out small bags of trash, and was able to prepare meals on a daily basis, do laundry, iron, clean for a half hour, rake leaves, and grocery shop.  (170-172).  He could pay bills, count change, handle a savings account, and use a

---

49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

checkbook. (Tr. 172). He could not drive due to a suspended license, but used public transportation and the "cat share a ride" program. (Tr. 172).

Regarding his concentration and memory, Plaintiff denied having memory problems or needing special reminders to take care of his personal needs and to take his medicine. (Tr. 171). He also stated that he did not need anyone to accompany him when he left his house. (Tr. 173). He could pay attention for "as long as needed," and followed written and spoken instructions "very well." (Tr. 174).

Socially, Plaintiff talked to his friends on the phone on a daily basis, and went to appointments and church. (Tr. 193). He also watched tv and read books. (Tr. 173). In the function report, when asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. 174). Regarding medications, Plaintiff reported that he took Flovent and Advair for asthma, and hydrocodone for pain. (Tr. 178).

At his hearing, Plaintiff alleged that the following combination of physical problems prevented him from being able to work since June of 2010: (1) lower back pain; (2) bilateral shoulder pain; (3) asthma; and (4) obesity. (Tr. 38-41). In terms of physical limitations, he testified that he could not bend over to touch his

6

toes, but could get his socks and shoes on by pulling up a leg. (Tr. 33). He could

not squat down to pick something up from the ground, and could only climb four

(4) or five (5) stairs and walk half a block before having to stop to rest due to

lower back pain. (Tr. 33-34). He testified that he could stand for approximately

twenty (20) to thirty-five (35) minutes, but could then only sit for ten (10) to

twenty (20) minutes before experiencing pain down his left side. (Tr. 35).

Medication only helped for a short time before the pain continued to worsen. (Tr.

36). He testified that he could carry between ten (10) and twenty (20) pounds with

his left hand, "but with the help of [his right] hand, [he] could lift much more."

(Tr. 39, 174). At the time of the hearing, Plaintiff was using a cane that was not

prescribed to him by a doctor. (Tr. 36-37). He claimed that he could no longer

cook, do yard work, shop, or do the laundry. (Tr. 32-33).

## MEDICAL RECORDS

Before the Court addresses the ALJ's decision and the arguments of

counsel, Plaintiff's relevant medical records will be reviewed in detail, beginning

with records from his alleged disability onset date of June 2, 2010.

On August 17, 2010, Bravein Amalakuhan, M.D. of Pinnacle Health

evaluated Plaintiff's left shoulder pain and lower left back pain complaints. (Tr.

224). This examination revealed pain in the left shoulder upon motion, pain with

7

straight leg raising to thirty (30) degrees, and pain in the left lower lumbar region on palpation. (Tr. 224). Plaintiff reported that his pain worsened with prolonged standing. (Tr. 224). Dr. Amalakuhan prescribed Tramadol for pain. (Tr. 225).

On October 4, 2010, Plaintiff had an appointment with Gregory Hanks, M.D. at the Orthopedic Institute of Pennsylvania ("OIP") for an evaluation of his shoulder and neck pain, and finger numbness and locking. (Tr. 211). An examination revealed a normal sensory and motor exam of the hand, slight pain with range of motion in the neck, palpable crepitus in the subacromial region of the left shoulder, weakness in abduction and forward elevation graded at four (4) out of five (5), and positive Hawkins and Neer impingement testing. (Tr. 211). Plaintiff was diagnosed with left shoulder probable full-thickness rotator cuff tear, AC joint degenerative disease with worsening symptoms, and finger numbness with a history of locking of unknown etiology. (Tr. 211). On October 18, 2010, Dr. Hanks confirmed an MRI's report that Plaintiff had a full-thickness rotator cuff tear in his left shoulder, degenerative joint disease, and a slightly high-riding humeral head. (Tr. 213). Dr. Hanks discussed surgical options to repair Plaintiff's left shoulder because a prior repair on his right shoulder for a similar problem gave Plaintiff favorable results. (Tr. 211-213).

On October 19, 2010, Plaintiff presented to Dr. Amalakuhan for a follow-up

appointment.  The treatment notes for this visit are illegible.  (Tr. 221).  Plaintiff

complained of continued left shoulder pain, decreased grip strength, and pain on

movement of his arm.  (Tr. 219-220).  He reported that the Tramadol prescribed

was not helping his pain, and scheduled left rotator cuff surgery for November 26,

2010.  (Tr. 220).

On October 27, 2010, Plaintiff had an appointment at Pinnacle Health's

Comprehensive Occupational Rehabilitation Center for an electrophysiologic

evaluation.  (Tr. 271).  The conclusion of this study was normal.  (Tr. 271-272).

The report stated the following:

> There is currently no electrophysiologic evidence of median,
> ulnar or radial nerve entrapment/ neuropathy within the left
> upper extremity at this time.  Needle EMG analysis of all
> selected muscles representing the C5-T1 myotomes on the left
> was normal, which decreases the chances of a more proximal
> brachial plexopathy or cervical nerve root derangement.

(Tr. 272).

On November 12, 2010, Plaintiff visited Balint Balog, M.D. for his low

back and left sciatic pain that reportedly dated back to a car accident in 2002.  (Tr.

267).  The examination revealed: Plaintiff was six (6) feet tall and weighed two

hundred sixty-four (264) pounds; guarding with lumbar spine mobility; positive

straight leg raising on the left to eighty (80) degrees and negative on the right to

ninety (90) degrees; left sciatic notch tenderness; trace patellar reflexes bilaterally; and tingling and sensory deficit in the left lower extremity. (Tr. 267-268). Dr. Balog diagnosed Plaintiff with low back and left sciatic pain and disc herniation versus stenosis. (Tr. 268). Dr. Balog recommended an MRI to further investigate these issues. (Tr. 268).

On November 19, 2010, an MRI of the lumbar spine showed disc bulging at L3-4 and L4-5 with facet arthropathy and stenosis, central disc bulging at L2-3 with central canal stenosis, a left paracentral disc bulge at L5-S1 with mass effect on the left lateral recess and facet arthropathy causing mild canal stenosis and moderate left neuroforaminal stenosis, and a mild disc bulge at S1-2 with mild facet arthropathy and canal stenosis. (Tr. 269-270).

On November 26, 2010, Dr. Hanks performed a left shoulder arthroscopy with debridement of labral tears and undersurface cuff fraying, a rotator cuff repair, and distal clavicle resection on Plaintiff. (Tr. 250-251). On December 2, 2010, on a Public Welfare form, he declared that Plaintiff was temporarily disabled for twelve (12) months or more beginning on November 26, 2010 to June 26, 2012 based on disc herniation, left sciatic pain, a left rotator cuff tear, and AC degenerative joint disease. (Tr. 296). He based his opinion on physical exams, review of the medical records, clinical history, and appropriate tests and diagnostic

10

procedures.  (Tr. 296).

Plaintiff's first post-surgical follow-up with Dr. Hanks was on December 8, 2010.  (Tr. 265).  Plaintiff reported that the pain was bearable during the day.  (Tr. 265).  The examination revealed normal bruising and minimal discomfort on rotation of the left shoulder.  (Tr. 265).  Dr. Hanks was able to raise Plaintiff's shoulder in a forward elevation up to eighty (80) degrees comfortably.  (Tr. 265).

At a second post-surgical follow-up with Dr. Hanks on January 5, 2011, Plaintiff noted his left arm was very stiff.  (Tr. 263-264).  An examination revealed he had a painful arc on motion in the shoulder at sixty (60) degrees and raising up to one hundred (100) degrees.  (Tr. 264).  Dr. Hanks prescribed physical therapy, prednisone for post-surgical inflammation, and Ultram for pain.  (Tr. 264).

On January 7, 2011, Plaintiff had a follow-up appointment with Dr. Balog. (Tr. 263).  An examination revealed absent left Achilles reflex, trace right Achilles reflex, a painful range of motion in the left sciatic notch, and marked left sciatic notch tenderness.  (Tr. 263).  Dr. Balog reviewed results of a recent MRI, and diagnosed Plaintiff with left-sided lumbosacral radiculitis with L5-S1 disc herniation and composite lateral recess stenosis.  (Tr. 263).  On January 20, 2011, Plaintiff underwent an epidural injection of L5-S1.  (Tr. 284-285).

On March 23, 2011, Plaintiff had a follow-up with Dr. Hanks for left

shoulder pain that went down his left side and for difficulty raising his left arm above ninety (90) degrees. (Tr. 286). Dr. Hanks' examination revealed a painful arc above ninety (90) degrees, scapulothoracic dysrhythmia and persistent weakness, and tenderness in the scapula. (Tr. 286). Plaintiff received a second epidural on March 25, 2011 at the L5-S1 level. (Tr. 287-288).

On April 8, 2011, Plaintiff had an appointment with Dr. Balog. (Tr. 291). Plaintiff reported that the two (2) epidural injections helped somewhat, but that he still had some radiation of pain down to his left leg. (Tr. 291). Dr. Balog reported that Plaintiff was still functional, but that he had to stop periodically when walking. (Tr. 291). On examination, he moved slowly, grimaced and expressed pain when he changed position from sitting to standing, had a positive straight leg raise in the left leg at ninety (90) degrees and negative in the right to ninety (90) degrees, and had no focal sensory deficits. (Tr. 291). Plaintiff was diagnosed with chronic low back pain, including L5-S1 left-sided disc protrusion and S1 radiculitis. (Tr. 291). Plaintiff agreed that "he is not severe enough at this point to warrant any surgical intervention at this level." (Tr. 291).

On October 20, 2011, Michael Fernandez, M.D. evaluated Plaintiff for leg and back pain, and found a moderately positive straight leg raise for the left leg. (Tr. 292). Plaintiff was diagnosed with chronic low back pain with left lumbar

radiculopathy/radiculitis, and was prescribed Neurontin for pain.  (Tr. 293).

On October 31, 2011, an MRI conducted on the lumbar spine showed transitional anatomy with lumbarization at S1, central canal stenosis, a left paracentral disc protrusion abutting the left S1 nerve root in the canal, unchanged degenerative changes seen on a prior study, and mild to moderate neural foraminal narrowing at L3-4 and L4-5.  (Tr. 289-290).

On March 27, 2012, a Multiple Impairment Questionnaire was completed by Dr. Amalakuhan.  (Tr. 276-283).  At this appointment, Plaintiff complained of lower back pain at a ten (10) out of ten (10) on the pain scale, lower extremity numbness and decreased sensation, and chronic fatigue at an eight (8) out of ten (10) on the pain scale.  (Tr. 277).  Plaintiff was diagnosed with spinal cord foraminal narrowing at L3-L5 and herniated discs at S1 and S2 based on an MRI conducted in March of 2011.  (Tr. 276-277).  The evaluation found pain on palpation of the lower back, difficulty ambulating, and a positive straight leg raising test.  (Tr. 276).  Dr. Amalakuhan opined that Plaintiff was able to stand and walk for one (1) hour and sit for two (2) hours total in an eight (8) hour workday.  (Tr. 278).  Furthermore, he opined that Plaintiff would need a rest break for ten (10) minutes every hour.  (Tr. 281).  Plaintiff could never lift or carry anything over twenty (20) pounds, could occasionally lift or carry between five (5) and

twenty (20) pounds, and could frequently lift or carry five (5) pounds.  (Tr. 279).

Dr. Amalakuhan noted that Plaintiff would have no limitations on either his right

or left side in an eight (8) hour workday for the following categories: grasping,

turning or twisting objects; using fingers or hands for fine manipulations; and

using arms for reaching, including overhead reaching.  (Tr. 279-280).  Dr.

Amalakuhan also stated that Plaintiff's impairments were ongoing, and that he

expected they would last at least twelve (12) months.  (Tr. 281).  The evaluation

noted that Plaintiff's medications caused fatigue, that the pain did not respond to

epidurals and physical therapy, and that the pain, fatigue and other symptoms were

severe enough to interfere with Plaintiff's attention and concentration.  (Tr. 281).

Dr. Amalakuhan stated that the basis for his opinion was frequent clinical visits

with thorough exams.  (Tr. 281).

On March 29, 2012, Plaintiff had an appointment with Dr. Fernandez to

review the MRI results.  (Tr. 294).  Dr. Fernandez noted that Plaintiff had

moderately positive straight leg raising on his left leg, and that he was in moderate

distress.  (Tr. 294).  Dr. Fernandez diagnosed Plaintiff with left S1 radiculopathy,

and recommended that he undergo back surgery, including a laminectomy and

possible discectomy.  (Tr. 294-295).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).   Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Pierce v.

Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security,

529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence has been described as more than a mere scintilla of

evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an

adequately developed factual record, substantial evidence may be "something less

than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence."  Consolo v. Federal Maritime

Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir.

1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.
> 42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2,

1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014.  (Tr. 17).  The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled.  (Tr. 31).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of June 2, 2010, through his date last insured, March 31, 2014.  (Tr. 17).

At step two, the ALJ determined that Plaintiff suffered from the severe[9]

---

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's

combination of impairments of the following: "lumbosacral degenerative disc disease, status-post left shoulder open rotator cuff repair with acromioplasty and degenerative joint disease, and obesity (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 17).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 17).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of sedentary work with a sit/ stand option.[10] (Tr. 23-24). Specifically, the ALJ stated the following:

---

ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

10. The Social Security regulations define sedentary work as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a) and 416.967.

The record demonstrates a history of lumbosacral degenerative disc disease and obesity. Due to the [Plaintiff's] back impairment and obesity, the undersigned restricted the [Plaintiff] to the performance of sedentary work. The [Plaintiff] must be permitted to alternate between sitting and standing at will. The [Plaintiff] must avoid stooping, kneeling, bending, and climbing ladders. The [Plaintiff] is limited to occasional balancing, climbing of stairs, crouching, and crawling. The record further reveals a history of a left shoulder impairment. Accordingly, the undersigned finds that [Plaintiff] must avoid pushing, pulling, or bilateral over-the-shoulder reaching.

(Tr. 21).

At step five of the sequential evaluation process, considering the Plaintiff's age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 21).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the alleged onset date of June 2, 2010, and the date of the ALJ's decision. (Tr. 22).

## DISCUSSION

Plaintiff alleges that he became disabled on June 2, 2010 based on the following impairments: "lumbar spine impairment, herniated disc, bilateral torn rotator cuffs in the arm, soft tissue injuries of the arm, obesity[,] and asthma."

21

(Doc. 1, p. 2). In his Complaint and support brief, he argues that the ALJ's decision is not supported by substantial evidence because: (1) the ALJ failed to follow the treating physician rule; (2) the ALJ failed to properly evaluate Plaintiff's credibility; and (3) the ALJ relied on flawed VE testimony. (Doc. 13, p. 8).

In his brief in opposition, Defendant argues that: (1) the ALJ properly accorded limited weight to Dr. Amalakuhan's opinion; (2) the ALJ properly assessed Plaintiff's credibility; and (3) Plaintiff's Dictionary of Occupational Titles ("DOT") versus the VE argument fails. (Doc. 14, pp. 10-22). In his reply brief, Plaintiff disputes these contentions. (Doc. 15, pp. 1-5).

### 1.   Dr. Amalakuhan's Opinion

Plaintiff asserts that the ALJ erred in failing to follow the treating physician's rule because he failed to give controlling weight to Dr. Amalakuhan's opinion. (Doc. 13, pp. 8-12). Plaintiff states that the ALJ's reasoning that Dr. Amalakuhan's opinion was inconsistent with the clinical findings and observations in the treatment records was "so vague as to render the ALJ's analysis meaningless," arguing that the ALJ failed to "identify any evidence that contradicted the opinions from [Dr. Amalakuhan]," or that supported the conclusion that Plaintiff could perform a range of sedentary work. (Id. at 9-11).

Plaintiff contends that the ALJ failed to consider the following: "various factors including the opining parties' examining relationship, the treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 416.927( c)(2)-(6)[]. See also Social Security Ruling ("SSR") 96-2p (1996 WL 374188)." (Doc. 13, pp. 8-10, 12).

Defendant argues that the ALJ did not err in giving limited weight to Dr. Amalakuhan's opinion because it was not supported by or consistent with the objective findings. (Doc. 14, pp. 11, 13). Furthermore, Defendant states that the ALJ did take Dr. Amalakuhan's opinion into account in determining Plaintiff's RFC, which is evident in the ALJ's restrictive RFC finding. (Id. at 12-13).

In his reply brief, Plaintiff challenges this assertion by arguing that Dr. Amalakuhan's opinion was based on objective medical evidence, and contends that the ALJ's failure to consider the context of Dr. Amalakuhan's statements regarding Plaintiff's limitations was in error. (Doc. 15, pp. 2-3).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot

23

reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Morales, 225 F.3d at 316-18. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "[j]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In analyzing Plaintiff's RFC, the ALJ gave limited weight to the opinion of Dr. Amalakuhan for being inconsistent with and unsupported by the record. (Tr. 20). The ALJ stated:

> As for the opinion evidence, the undersigned notes the opinion of [Plaintiff's] treating physician, Bravein Amalakuhan, M.D., who noted that [Plaintiff] was able to lift or carry up to 20 pounds; stand or walk for up to one hour per day; and sit for up to two hours per day. (Exhibit 7F). Dr. Amalakuhan also

24

> noted that [Plaintiff] must avoid pushing, pulling, kneeling, bending and stooping.  The undersigned gave this opinion limited weight as it is inconsistent with and unsupported by the clinical findings and observations of [Plaintiff's] treating physicians and the record as a whole.

(Tr. 20).

Instead, the ALJ seemingly relied on the contrary medical opinion provided by Plaintiff's other treating physician, Dr. Balog, in reaching the conclusion that Plaintiff could perform a limited range of sedentary work.  (Tr. 20).  The ALJ stated:

> Further, [Plaintiff's] symptoms are well[-]controlled with medication and treatment, as noted by his physician, Dr. Balog, who observed that the [Plaintiff] could ambulate without any assistive devices and could perform heel-toe walking, with no gross motor weakness or atrophy (Exhibit 6F).  Similarly, the record reveals that treatment in connection with [Plaintiff's] left shoulder complaints, consisting of conservative care with his orthopedist and a course of physical therapy, was helping in ameliorating his symptoms.

(Tr. 20).  Furthermore, Plaintiff himself testified that he was able to:

> perform most personal care activities, prepare simple meals, perform household chores, wash dishes, do some laundry, do yard work, and shop in stores for food, attend medical appointments by himself, demonstrating a greater physical ability than alleged in connection with his application and appeal.  While none of these factors alone is inconsistent with a finding of disability, taken together, they are suggestive of an individual capable of performing work activity on a sustained basis within the above residual functional capacity.

25

(Tr. 21).

Upon review of the record and the ALJ's decision, it is determined that the ALJ identified evidence that contradicted Dr. Amalakuhan's opinion and that supported the conclusion that Plaintiff could perform a range of sedentary work. The ALJ did not outright reject Dr. Amalakuhan's opinion, but instead gave it limited weight. When deciding Plaintiff's RFC, the ALJ concluded the following:

> Due to [Plaintiff's] back impairment and obesity, the undersigned restricted [Plaintiff] to the performance of sedentary work. [Plaintiff] must be permitted to alternate between sitting and standing at will. [Plaintiff] must avoid stooping, kneeling, bending, and climbing ladders. [Plaintiff] is limited to occasional balancing, climbing of stairs, crouching, and crawling. The record further reveals a history of left shoulder impairment. Accordingly, the undersigned finds that [Plaintiff] must avoid pushing, pulling or bilateral over-the-shoulder reaching.

(Tr. 21). Therefore, while the ALJ gave limited weight to Dr. Amalakuhan's opinion, he still considered this opinion in reaching his restrictive RFC determination. Because the ALJ's decision discussed medical evidence contrary to Dr. Amalakuhan's opinion, and because he identified evidence to support his RFC finding, there is substantial evidence to support the ALJ's decision to give limited weight to Dr. Amalakuhan's opinion.

26

## 2.   **Plaintiff's Credibility**

In his Complaint and support brief, Plaintiff contends that the ALJ failed to
properly evaluate his credibility because his subjective testimony of his inability to
perform work was supported by competent medical evidence.  (Doc. 13, pp. 12-
13).  Plaintiff contends that his treatment was mischaracterized by the ALJ as
"routine and conservative," that the ALJ failed to point to any evidence that his
pain was more controlled than he alleged, and that Plaintiff's capacity to engage in
daily activities is not evidence "that he can perform the requirements of full-time
work 8 hours a day, 40 hours a week."  (Doc. 12, p. 13).  Defendant disputes this
claim, arguing the following:

> This is not a situation where the ALJ found Plaintiff to be not
> credible.  An unimpaired individual is presumed capable of a
> full range of heavy work.  Here, the ALJ credited Plaintiff's
> complaints in finding that he was unable to perform heavy
> work, was unable to perform medium work, was unable to
> perform light work, and was unable to perform even a full
> range of sedentary work because of his back and shoulder pain
> (Tr. 21).  The ALJ actually credited Plaintiff's complaints and
> even credited the fact that his obesity would limit his
> functioning (Tr. 18).

(Doc. 14, p. 16).  Defendant also presents a bullet-point list of medical evidence
that she contends undermines Plaintiff's credibility, and argues that the ALJ's
credibility finding is to be entitled great deference.  (Id. at 16-18).  In his reply

brief, Plaintiff contends that Defendant's bullet-point list was not discussed by the ALJ to support his credibility finding, and that Defendant cannot use these post-hoc rationalizations to support the ALJ's decision. (Doc. 15, p. 3).

As part of step four of the sequential evaluation process, once an ALJ concludes that there is a medical impairment that could reasonably cause the alleged symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)). This "requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id. In evaluating the intensity and persistence of a claimant's symptoms, an ALJ should consider (1) the claimant's history; (2) medical signs and laboratory findings; (3) medical opinions; and (4) statements from the claimant, treating and non-treating sources, and other persons about how the claimant's symptoms affect him/her. See 20 C.F.R. § 404.1529. Importantly, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." 1996 SSR LEXIS 4 (1996); 20 C.F.R. § 404.1529(c)(2).

"Generally, 'an ALJ's findings based on the credibility of the applicant are
to be accorded great weight and deference, particularly since an ALJ is charged
with the duty of observing a witness's demeanor and credibility.'" Fell v. Astrue,
2013 U.S. Dist. LEXIS 167100, *29 (M.D. Pa. 2013) (Conaboy, J.) (quoting
Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997));
Frazier v. Apfel, 2000 WL 288246 (E.D. Pa. 2000).  Social Security Ruling 96-7p
gives the following instructions in evaluating the credibility of the claimant's
statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p.  "In particular, an ALJ should consider the following factors: (1) the
plaintiff's daily activities; (2) the duration, frequency and intensity of the
plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type,
dosage, effectiveness, and side effects of any medication taken to alleviate the
symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any

measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's

prior work record; and (8) the plaintiff's demeanor during the hearing." Jury v.

Colvin, 2014 U.S. Dist. LEXIS 33067, *33 (M.D. Pa. 2014) (Conner, J.) (citing 20

C.F.R. § 404.1529(c)(3)).

In assessing Plaintiff's credibility in this case, the ALJ stated:

> [T]he [Plaintiff's] allegations have not been entirely consistent
> with the objective findings, in that the treatment received by
> [Plaintiff] relative to his impairments has been routine and
> conservative in nature. Further, [Plaintiff's] symptoms are
> well[-]controlled with medication and treatment, as noted by
> his physician. . . .
>
> Moreover, the undersigned does not find the allegations
> regarding the intensity, persistence, or limiting effects of
> [Plaintiff's] impairments entirely credible due to inconsistent
> information regarding daily activities given in the record, and
> the medical reports. In the record, [Plaintiff] described daily
> activities that are not limited to the extent one would expect,
> given the complaints of disabling symptoms and limitations.
> [Plaintiff] admitted that he retains the ability to perform most
> personal care activities, prepare simple meals, perform
> household chores, wash dishes, do some laundry, do yard work,
> and shop in stores for food, attend medical appointments by
> himself, demonstrating a greater physical ability than alleged in
> connection with his application and appeal. (Exhibit 4E;
> Testimony). While none of these factors alone is inconsistent
> with a finding of disability, taken together, they are suggestive
> of an individual capable of performing work activity on a
> sustained basis within the above residual functional capacity.

(Tr. 20-21). Thus, the ALJ considered the aforementioned Jury factors in his

analysis, including daily activities, treatment and measures used to relieve symptoms, and the duration, frequency and intensity of Plaintiff's symptoms, which is evident in the resulting restrictive RFC finding.

Upon review of the record and the ALJ's decision, it is determined that there is substantial evidence to support the ALJ's credibility finding of Plaintiff. The ALJ is correct that there were enough inconsistencies in the record regarding Plaintiff's self-reported limitations that weakened his credibility. In the Function Report, Plaintiff indicated that he could dress, shower, do dishes, and take out small bags of trash. (Tr. 170-171). He could also prepare meals, do laundry, iron, clean, do yard work, and grocery shop. (171-172). He could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 172). When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. 174). Plaintiff denied having memory problems or needing special reminders to take care of his personal needs, to groom himself, or to take his medicine. (Tr. 171). He also stated that he did not need anyone to accompany him when he left the house. (Tr. 173). Also, he could pay attention for "as long as needed," and followed written and spoken instructions "very well." (Tr. 174). Plaintiff talked to his friends on

31

the phone on a daily basis and attended appointments and church. (Tr. 193). He also watched television and read books. (Tr. 173).

At his hearing, he claimed that he could no longer cook, clean, do yard work, shop, or do the laundry. (Tr. 32-33). He testified that he could not bend over to touch his toes, but could get his socks and shoes on by pulling up a leg. (Tr. 33). He testified that he could carry between ten (10) and twenty (20) pounds with his left hand, "but with the help of [his right] hand, [he] could lift much more." (Tr. 39, 174).

Plaintiff contends that the ALJ mischaracterized the treatment as "conservative," and failed to cite any evidence to support his conclusion that Plaintiff's pain was more controlled than he alleged. (Doc. 12, p. 13). However, the record supports the ALJ's conclusion that treatments, while not wholly effective, helped ameliorate Plaintiff's pain, which undermined his testimony that nothing helped his pain. (Tr. 265, 291).

Additionally, while Plaintiff is correct that his "capacity to engage in some limited activities of daily living for brief periods of time is not evidence that he can perform the requirements of full-time work 8 hours a day, 40 hours a week," the ALJ can still consider daily activities in determining Plaintiff's credibility and the degree to which self-reported pain and limitations can be accepted as true.

(Doc. 13, p. 13); <u>See</u> SSR 96-7p; <u>Colvin</u>, 2014 U.S. Dist. LEXIS 33067, *33.

In conclusion, the ALJ considered the appropriate factors in assessing Plaintiff's credibility, and was correct that there were enough inconsistencies in the record to undermine his credibility. The ALJ did not find Plaintiff to be not credible, but only partially credible. (Tr. 20-21). The restrictive RFC finding is evidence that ALJ found Plaintiff credible to some degree, albeit not completely, as the ALJ concluded Plaintiff could perform only a limited range of sedentary work based, in part, on his subjective complaints. (Tr. 20-21). Also, as mentioned, the ALJ's credibility finding is to be accorded great deference. <u>See</u> <u>Fell</u>, 2013 U.S. Dist. LEXIS 167100, *29 . As such, it is determined that there is substantial evidence to support the ALJ's credibility finding.

### 3.   <u>Vocational Expert Testimony</u>

Plaintiff contends that the ALJ erred in "relying on testimony from the [VE] that conflicts with the [DOT]." Plaintiff believes the DOT does not detail whether jobs can be performed with a sit/stand option despite the fact that the Commissioner has taken administrative notice of this fact. Plaintiff argues the VE did not explain the conflict between her testimony and the DOT's silence on the issue of jobs with a sit/stand option. (Doc. 13, pp. 13-14). Plaintiff further argues that when there is a conflict between the testimony of the VE and the DOT, the

ALJ must elicit "a reasonable explanation for the conflict before relying upon the VE evidence to support a decision about whether a claimant is disabled." (Doc. 13, p. 14) (quoting SSR 00-4p).

Defendant challenges this claim, arguing that the ALJ appropriately noted that the VE's testimony was consistent with the DOT, with the exception of the testimony regarding the sit/stand option as defined by the VE's experience, expertise and analysis within the field. (Doc. 14, p. 19). Defendant admits that the VE was negligent in failing to mention the DOT's silence on jobs with a sit/stand option, but argues that this was a harmless error and does not justify remand because the VE's testimony was not in conflict with the DOT. (Id. at 20).

The administrative law judge has a duty to develop the record and flesh out any inconsistencies. Social Security Regulation 00-4p states:

> Occupational evidence provided by a [VE] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [VE] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, *2; SSR LEXIS 8, *4.

34

The conflict allegedly arises because the DOT is silent on the sit/stand

option presented by the ALJ to the VE in his hypothetical, and included in the

RFC.  Plaintiff contends that the ALJ should have elicited a "reasonable

explanation" regarding the conflict.  However, this Court does not agree with

Plaintiff's assessment of this situation.  In a case similar to the one at hand, Judge

Conaboy of this Court stated:

> In general terms, the VE's observation that these positions
> allow change of position at will, is appropriately viewed as a
> vocational expert's application of her expertise, her
> "knowledge, experience, and observations" in the words of the
> ALJ. [] Her reduction in the number of positions based on the
> conflict is similarly appropriate.
>
> Viewed in this context, the ALJ does not run afoul of SSR 00-
> 4p, 2000 SSR LEXIS 8 regarding [these] positions because he
> was not presented with an "apparent unresolved conflict."
> Rather, a fair reading of the colloquy here is that the ALJ was
> presented with a conflict (made apparent by the VE's
> testimony) and the VE resolved the conflict to the ALJ's
> satisfaction in the course of her testimony.  In this context, the
> ALJ would be under no obligation to elicit further testimony
> from the VE on the sit/stand issue for the [positions] for which
> the VE testified a reduction in numbers would be appropriate
> based on this limitation. . . . Importantly, the ALJ
> acknowledges in his decision that the VE's testimony is
> inconsistent with the DOT. . .

Minichino v. Colvin, 955 F. Supp. 2d 366, 381 (M.D. Pa. 2013) (Conaboy, J.).  In

the case at hand, before the VE testified, the ALJ made it clear to the VE that she

had to give an explanation for any conflicts between her testimony and the DOT.

(Tr. 43). Next, in his hypotheticals to the VE, the ALJ included the sit/stand

limitation as he stated:

> consider the following, sedentary work; a sit/stand option at
> will; never push/pull; occasional stairs, balance, crouch, crawl;
> never ladders, stoop, kneel or bend; and never any over-the-
> shoulder reach.

(Tr. 46). The VE's responses indicate that she implicitly acknowledged that the

relevant DOT sections did not include a sit/stand option because she noted a

reduction in the number of existing jobs based on a sit/stand option for each job

Plaintiff could perform. (Tr. 45-46). Additionally, the ALJ was aware of and

acknowledged the conflict because he stated that the VE's testimony was

consistent with the DOT with the exception of the sit/stand option. (Tr. 22).

Based on the holding in Patrick v. Astrue, in which the Undersigned

remanded a social security case based on a sit/stand option conflict that went

unresolved, Plaintiff argues that the Commissioner's decision should be vacated

and the case remanded. 2012 U.S. Dist. LEXIS 126831 (M.D. Pa. Sept 6, 2012)

(Nealon, J.). However, in Patrick, the ALJ pointedly asked the vocational expert

whether his testimony conflicted with the DOT, and the vocational expert

explicitly testified it did not, despite there being a sit/stand conflict present. Id. at

36

*14. In accordance with the rationale above and the facts of this case, the conflict was implicitly acknowledged by the VE in her response to the hypotheticals, and was acknowledged and understood by the ALJ in arriving at his RFC determination.  Therefore, it is determined that substantial evidence supports the ALJ's reliance on the VE's testimony because there was no "apparent unresolved conflict" between the VE's testimony and the DOT.

## CONCLUSION

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed and the appeal will be denied.  A separate order will be issued.


**Date**: August 28, 2014

United States District Judge

37